Charles WILLOUGHBY, Appellant,

v.

GENCORP, INC. (Formerly General
Tire & Rubber Company,
Inc.), Appellee.

and

GENCORP, INC. (Formerly General
Tire & Rubber Company, Inc.),
Cross–Appellant,

v.

Charles WILLOUGHBY, Cross–Appellee.

Nos. 89–CA–2487–MR, 89–CA–2539–MR.

Court of Appeals of Kentucky.

Dec. 21, 1990.

Discretionary Review Denied
by Supreme Court June 26, 1991.

Mark D. Pierce, Paducah, for appellant-cross-appellee.

S. Boyd Neely, Mayfield, for appellee-cross-appellant.

Before HOWERTON, C.J., and CLAYTON and McDONALD, JJ.

McDONALD, Judge.

Charles Willoughby was employed by Gencorp, Inc. in 1977. In May, 1984, he incurred a work-related injury to his right elbow and neck. He received temporary disability benefits through June 4, 1984, when he was released to return to work. His condition, however, caused him to miss further work in July and August during which period Willoughby was examined by several doctors. On October 22nd he was released to work by his treating physician, Dr. Noonan, but with a thirty-pound weight restriction. On October 23, 1984, Willough-by had a meeting with company personnel as he had been informed by union representatives that he would need no less than a sixty-pound restriction in order to return to work.

According to Willoughby's trial testimony the following conversation with management took place:

Q.179 What time did you go to General Tire?

A. It was around eleven. My shift didn't start until four in the afternoon. I entered and in come Barry Craig and Jack Dunning right in behind me and he asked ...

Q.180 Where did you enter—in Mr. Herndon's Office?

A. Yes, in Mr. Herndon's office. He was on the phone and they entered right in behind me and he had just said what are you doing in here and I said I'm here to give my doctor's statement to you to turn in and he jerked it out of my hand.

Q.181 Who did?

A. Barry Craig jerked it out of my hand and looked at it.

Q.182 Who is the boss of those three guys that were in there?

A. Barry Craig.

Q.183 Do you know what his title is?

A. No, Sir, I don't but when he hollered, they moved.

Q.184 Tell us what happened that day.

A. Barry Craig said well, you just don't want to work very much, do you and I said yes, Sir, I do and I'm sorry Sir, the doctor took me off and it was your doctor that did these things and took me off. And then he asked me ... then he asked me when did I work last and I told him and he said why don't you just quit and I said no, Sir, I wanted to work and I had done nothing wrong. (Reporter's Note: Witness is crying.) I said that I had a doctor's statement and I told him about seeing the doctor and I told him I went back and tried to see him on the 22nd but that he wasn't there and he kept asking me all kind of questions that wasn't concerning to the work and I

told him that I wasn't going to quit and I was going to see another doctor and as I was leaving, him and Jack Dunning, he pointed his finger at me and uh ... uh ... (Reporter's Note: witness still crying.) ... and he pointed his finger at me and he said I'm going to get you one way or the other.

Q.185 Who was doing all the talking during this period of time? Was it Barry Craig?

A. Barry Craig was doing much of the talking. Jack Dunning was whispering in his ear occasionally.

Q.186 What kind of tone of voice was he using?

A. Rough. He sounded mad.

Q.187 Now, how did it end up then?

A. I started out the door and he said I'm going to get you one way or the other.

Willoughby tried without success to get the weight restriction lifted. Apparently a misunderstanding arose at the meeting with management: he thought they were aware the weight restriction was for a three-week time period and that Herndon (the personnel manager) would get in touch with him if any work came open he could perform; they thought he would report back to them after seeing yet another doctor. In any event, Willoughby did not communicate further with Gencorp and was terminated on October 29 under a provision of his union's contract with the company requiring that employees report continued absences from work within three working days. A grievance was filed and the matter taken to arbitration. The umpire determined the firing to be a "legitimate exercise" of the company's prerogative under the contract.

Prior to the arbitration Willoughby filed this action in the Graves Circuit Court alleging Gencorp wrongfully discharged him "as a result of his work-related injuries and claims for appropriate benefits pursuant to KRS Chapter 342 ..." The case proceeded to trial in October, 1989, five years after the firing. At the conclusion of Willoughby's proof the trial court directed a verdict in favor of the employer. The court explained that it believed that Willoughby failed to present any evidence that the company acted out of a motivation to fire him because of his worker's compensation claim. We believe the court erred in taking the case from the jury.

■ Before addressing Willoughby's appeal we will dispose of the issues raised in Gencorp's cross-appeal. Gencorp asserts that Kentucky does not recognize Willoughby's cause of action. Because Willoughby was a union employee Gencorp argues he was not an "at-will" employee and that the protections offered by *Firestone Textile Co. v. Meadows*, Ky., 666 S.W.2d 730 (1983) do not apply to employees working under a union contract. This issue was decided adversely to the employer in the recent case of *Bednarek v. United Food and Commercial Workers International Union, Local Union 227*, Ky. App., 780 S.W.2d 630 (1989), a well reasoned opinion with which we totally agree. Although aware of the *Bednarek* case, Gencorp cites us to cases from other jurisdictions. We find our authority to be persuasive and appropriate under the circumstances. *See also Lingle v. Norge Division of Magic Chef, Inc.*, 486 U.S. 399, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988).

■ Gencorp further contends Willoughby's tort claim is barred by the doctrine of collateral estoppel. Its position is that the umpire's decision in the arbitration proceeding held after this claim was filed (which upheld the firing), as well as a decision of a hearing officer in the employer's favor in Willoughby's claim for unemployment compensation[1] together preclude the current wrongful discharge suit. Collateral estoppel does not, we believe, have any bearing on the instant claim. Neither the umpire in the arbitration proceeding nor the unemployment hearing officer had the ability to litigate Willoughby's tort claim for wrongful termination in retaliation for pursuing workers' compensation benefits. Neither made any findings bearing on the issue of workers' compensation. That both

---

**1.** This decision was not appealed and thus not reviewed.

found that Gencorp had a legitimate reason to fire Willoughby does not preclude a jury from determining that the purported reason was a pretext and that the employer was motivated by impermissible reasons in discharging Willoughby. *See Sedley v. City of West Buechel*, Ky., 461 S.W.2d 556 (1970), *Kentucky Commission on Human Rights v. Lesco Manufacturing & Design Co., Inc.*, Ky.App., 736 S.W.2d 361 (1987), *Barnes v. McDowell*, 848 F.2d 725 (1988) and *Blair v. City of Winchester*, Ky.App., 743 S.W.2d 28 (1987).

■ In considering the merits of appeal we are guided by the well established principle that a motion for a directed verdict should not be granted "unless, with *all inferences* a jury could justifiably draw from the evidence, the evidence would not be sufficient to sustain the verdict." *Investors Heritage Life Insurance Company v. Colson*, Ky.App., 717 S.W.2d 840 (1986) (emphasis added). Rarely in cases where one must prove improper motive does one have a "smoking gun" to present to the jury. A plaintiff frequently must rely on circumstantial evidence and the inferences that can be drawn therefrom to make his or her case.

■ Willoughby correctly points out that the cause of action for retaliatory discharge is relatively new to this jurisdiction. He asserts that our trial courts "have no reasonable standards to apply until a number of such cases have been determined by juries." Regardless, it is incumbent on the employee to show at a minimum that he was engaged in a statutorily protected activity, that he was discharged, and that there was a connection between the "protected activity" and the discharge. *See Clifford v. Cactus Drilling Corporation*, 353 N.W.2d 469 (Mich.1984) (Williams, J. dissenting); *Firestone Textile Co. Div. v. Meadows, supra* and *Grzyb v. Evans*, Ky., 700 S.W.2d 399 (1985).

Clearly under the *Firestone* case, Willoughby was engaged in a statutorily protected activity when he was discharged. Though he had not yet filed a claim for permanent benefits, he had received some temporary benefits and was receiving medical treatment for his injuries. Justice Leibson, writing for the majority in *Firestone*, held as follows:

> In enacting KRS Chapter 342 of the Kentucky Revised Statutes, the legislature set forth *a comprehensive scheme for compensating employees injured on the job*. It is an important public interest that injured employees shall receive, and employers shall be obligated to pay, for medical expenses, rehabilitative services and a portion of lost wages. Injured employees should not become public charges. If that is the public policy of Kentucky, and it is, then action on the part of an employer which prevents an employee from asserting his *statutory right to medical treatment and compensation violates that policy*. The only effective way to prevent an employer from interfering with his employees' rights to seek compensation is to recognize that the latter has a cause of action for retaliatory discharge when the discharge is motivated by the desire to punish the employee for seeking the benefits to which he is entitled by law. *Id.* at 734 (emphasis added).

Willoughby had direct evidence that he was pursuing a statutorily protected activity and that he was discharged. He attempted to show that he was fired for exercising his rights under KRS Chapter 342 by the testimony of his conversation with management less than a week before his discharge. Clearly that testimony is evidence that the employer possessed a hostile attitude toward Willoughby. Statements such as "why don't you just quit," "you just don't want to work very much, do you?" and threats to "get" Willoughby "one way or the other," all made contemporaneous to Willoughby's presentment of a doctor's statement restricting his work-related activities due to a work-related injury, sufficiently show there to have been a connection between his discharge and the pursuit of his rights under the legislative "scheme for compensating employees injured on the job." *Id.* Admittedly Willoughby had missed considerable work due to his injuries, most at the direction of a

doctor selected by the employer. When that doctor wasn't successful in healing Willoughby's injury, he was referred to specialists, including Dr. Noonan, a neurosurgeon who placed the weight restriction on Willoughby at the time of the firing.

Further, that the failure to report for three days was a pretextual reason for firing Willoughby can be gleaned from Willoughby's testimony that Herndon told him that he (Herndon) would get back in touch with Willoughby. Although the union contract required Gencorp employees to report an absence within three days, the jury could believe that Willoughby was excused from this requirement as he reported to management the thirty-pound weight restriction, management informed Willoughby it had no work for anyone with such a restriction and Herndon promised to get back in touch with Willoughby.

Of course, in presenting its case Gencorp can deny making such statements to Willoughby or explain its hostility as resulting from nonwork-related reasons. The jury can then decide what motivated Gencorp to discharge Willoughby.

■ Finally Willoughby alleges errors in the trial court's exclusion of certain testimony he attempted to introduce bearing on the issue of Gencorp's motive in firing him. We believe the court's exclusion of the testimony of several witnesses that Gencorp, a self-insurer, maintained a strong defense posture in all its workers' compensation cases was rightfully excluded. However, we hold the trial court erred in excluding the testimony of two workers who alleged they were harassed and treated wrongfully by Gencorp after each sustained a work-related injury and sought benefits. The depositions of both Tim King and Kenneth Edwards show treat-

ment strikingly similar to that alleged by Willoughby when they attempted to secure light-duty work after being injured on the job. In fact, each had been terminated for the same purported reason as Willoughby, that is failing to report in for three days. One, like Willoughby, alleged he was led to believe he did not have to call in, as he was told by management there was no light-duty work and that Gencorp would get back in touch with him. This evidence is relevant and shows the employer's attitude toward those similarly situated to Willoughby and its motive in terminating him.

Gencorp's reliance on *Schrand v. Federal Pacific Electric Co.*, 851 F.2d 152 (6th Cir.1988), is misplaced as the facts in that case are so dissimilar. In *Schrand* the employee who alleged he was fired because of his age tried to prove his case by the firing of two other workers. These other workers were employed at different locations. The decision to terminate them was made by managers not involved in the decision to terminate Schrand. In the instant case the workers whose testimony was excluded worked in the same plant as Willoughby and under the same management. On remand this evidence should be admitted.

The judgment of the Graves Circuit Court is accordingly reversed and remanded for further proceedings consistent with this opinion. The cross-appeal is affirmed.

All concur.